**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

REFUS HOLLOWAY and LUCIARE
FRIPP,

    Plaintiffs,

v.                                                Case No:  6:15-cv-129-ORL-40GJK

THE CITY OF ORLANDO, WILLIAM
ESCOBAR, and JOEL WILLIAMS,

    Defendants.

---

**ORDER**

This cause comes before the Court without oral argument on Defendants', City of Orlando and Joel Williams, Motion for Summary Judgment (Doc. 27), filed May 2, 2016. On May 16, 2016, Plaintiffs responded in opposition (Doc. 29), and, on May 31, 2016, Defendants replied (Doc. 30). Upon consideration and review of the record as cited by the parties in their respective briefs, Defendants' Motion for Summary Judgment will be granted in part and denied in part.

**I.    BACKGROUND[1]**

On March 15, 2014, Plaintiffs, Luciare Fripp ("Fripp") and Refus Holloway ("Holloway"), were visiting their cousin, Octavius Sheals ("Sheals"). (Doc. 27-2, 23:8–10). Sheals' apartment is situated in a high-crime area of Orlando, Florida. (*Id.* at 32:13–17; Doc. 27-5, p. 1). Fripp and Holloway arrived at Sheals' apartment at an undetermined

---

[1] This account of the facts is drawn from parties' motions, depositions, and video evidence. Where parties disagree on facts or there is not clear video evidence, the Court employs the facts asserted by the non-movant. *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

1

point in the evening. (*See* Doc. 27-2, 24:2–7; Doc. 27-3, 22:7–11). During their time at Sheals' apartment, both Fripp and Holloway were lightly drinking—neither of them partaking in more than one beverage. (Doc. 27-2, 24:15–21; Doc. 27-3, 26:12–22). However, Holloway had consumed "[t]wo cups of peach Ciroc approximately three to four hours prior to the incident." (Doc. 27-2, 50:24–51:6). After spending some time in Sheals' apartment, Fripp, Holloway, and Sheals moved outside because the apartment did not have functioning air conditioning. (Doc. 27-3, 28:1–6; Doc. 27-4, 15:21–16:1).

While outside, a fight began between two men in an open area near the street and Sheals' apartment. (Doc. 27-3, 38:3–25; Doc. 27-4, 18:4–11). Fripp and Holloway did not know the men at the time. (Doc. 27-2, 25:24–25; Doc. 27-3, 38:14–19). During the fight, one of the men pulled a gun from his pocket, but the weapon fell to the ground. (Doc. 27-3, 39:5–11, 40:18–20; Doc. 27-4, 20:23–21:12). After seeing the gun, Sheals picked it up and placed it in his pocket to prevent it from being used in the fight. (Doc. 27-4, 20:23–21:12, 40:21–24). Sheals was not armed prior to picking up the gun. (*Id.* at 21:21–23). Police were eventually called because of the fight and responded to Sheals' apartment. (Doc. 27-5, p. 1; Doc. 27-7, 6:6–14).

Defendants, Officers Joel Williams and William Escobar, arrived at the scene at approximately 11:30 p.m. (Doc. 27-1, p. 2). Officers Williams and Escobar were members of the same patrol squad and were in the same vehicle at the time. (Doc. 27-7, 6:23–7:14). When the Officers arrived at the scene, they drove up to a group of people gathered in a grassy area near the sidewalk and the street—the group was comprised of approximately five or six individuals, including Fripp and Holloway. (Doc. 27-3, 30:3–12; Doc. 27-7, 8:23–9:1). Sometime after the fight, Sheals started walking towards his

apartment and was farther from the street than the rest of the group. (Doc. 27-4, 24:18–25:2).

The Officers arrived at the scene without their vehicle's emergency lights or siren activated. (Doc. 27-2, 29:21–23; Doc. 27-3, 33:15–22; Doc. 27-6, 14:1–6; Doc. 27-7, 9:2–6). The parties vary in their account of what occurred when police first exited their vehicle. Fripp avers that one of the Officers exited the vehicle, asked Sheals why he was running, and then "immediately grabbed" his arm. (Doc. 27-3, 37:10–19). Holloway, on the other hand, claims that the police "ran toward [his] cousin" and then "kicked his feet up from under him." (Doc. 27-2, 30:19–23). Officer Williams and Officer Escobar claim that Sheals was uncooperative with verbal commands to stop moving, (Doc. 27-6, 16:13–17:5; Doc. 27-7, 12:8–15), and that force was only used following Sheals' disobedience and the discovery of the gun in his pocket, (Doc. 27-6, 17:6–11; Doc. 27-7, 12:8–15). Despite their differing accounts, all pertinent testimony concludes that Sheals was put on the ground, placed in handcuffs, and the handgun in his pocket was seized by Officer Williams. (Doc. 27-2, 33:20–23; Doc. 27-3, 43:11–18; Doc. 27-4, 26:20–27:3; Doc. 27-6, 17:6–11; Doc. 27-7, 13:5–14).

While Sheals was being confronted by Officers Williams and Escobar, Holloway attempted to speak with them and gather information about the situation. (Doc. 27-2, 33:24–34:15). Holloway claims that he never approached the Officers too closely and was twelve to fifteen feet away when he began to speak to them. (*Id.* at 34:2–9). According to Holloway, Officer Williams then "turned completely around and charged at [him]," (*id.* at 34:18–21), before commanding him to back up, (*id.* at 35:6–11). Officer Williams avers

that Holloway came within "arm's reach" and was aggressively intervening in a manner that made Officer Williams fear for his safety. (Doc. 27-7, 18:7–24).

While backing up, Holloway states that Officer Williams attempted to kick him, and that the kick landed near his groin. (Doc. 27-2, 35:15–23). In order to cover himself, Holloway placed his hands over his groin and, in doing so, caught Officer Williams' foot in the middle of the kick. (*Id.*). Officer Williams alleges that Holloway intentionally grabbed his foot and refused to release it—nearly causing Officer Williams to fall to the ground. (Doc. 27-7, 20:6–21:2). Following the contact between Holloway and Officer Williams' foot, Officer Williams ordered Holloway on the ground. (Doc. 27-2, 36:6–18). However, before Holloway was on the ground, Officer Williams used his officer-issued chemical spray to control Holloway and ensure immediate compliance. (*Id.*; Doc. 27-7, 21:3–15). With Holloway now on the ground, Officer Williams proceeded to supervise Sheals while Officer Escobar began to interact with Holloway. (Doc. 27-7, 22:18–25). Between 11:34 p.m. and 11:39 p.m., three more police officers arrived to the scene to assist Officer Williams and Officer Escobar. (Doc. 27-1, p. 2).

According to Holloway, Officer Escobar walked over and immediately immobilized him. (*See* Doc. 27-2, 36:22–37:3; 38:18–23). From this point forward, Fripp began recording the incident with her cell phone camera. (Doc. 29-1; Doc. 27-2, 36:19–37:3). Additionally, one of the officers that arrived later at the scene, Donald Lacentra ("Officer Lacentra"), was equipped with a body camera and filmed the events upon his arrival. (Doc. 29-2).

Officer Escobar knelt next to Holloway, placed the handcuffs on him, punched him multiple times on the side of the head, and informed him that he was a cop—asking "do

4

you understand, you stupid motherfucker?" (Doc. 29-1, 0:00–00:07). Officer Escobar then grabbed Holloway by his shirt and dragged him stomach-down approximately six to eight yards before throwing him back to the ground. (*Id.* at 00:07–00:12). With Holloway face-down on the ground, Officer Escobar then kicked Holloway on the back of his right leg and pushed Holloway's body into the ground. (*Id.* at 00:14–00:23). During Officer Escobar's interactions with Holloway, Officer Williams stood near Sheals—simultaneously watching the crowd, Sheals, and Holloway. (*Id.* at 00:00–00:24).

After the officers handcuffed and immobilized Sheals and Holloway, they began to move the men toward their police vehicles. (*Id.* at 00:45). Officer Williams helped Sheals to his feet and walked him to the patrol vehicles. (*Id.* at 00:45–00:56). Next, Officer Escobar grabbed at Holloway's arms and abruptly pulled his wrists to force him to his feet. (*Id.* at 00:57–01:03). Officer Escobar then led Holloway to Officer Lacentra's patrol vehicle, patted down his body, and placed him in the back seat. (Doc. 29-2, 01:29–02:08; 03:22–03:37). Holloway was arrested for battery on a law enforcement officer, resisting an officer with violence, and resisting an officer without violence. (Doc. 27-2, 52:9–53:2).

While en route to a secondary location away from the scene, Holloway informed Officer Lacentra that he was experiencing immense pain. (*Id.* at 08:27–10:43). Officer Lacentra consistently responded to Holloway's requests—informing him that the officers would help remove the chemical spray as soon as possible. (*See, e.g.*, *id.* at 09:18–09:23). Upon arrival at the second location, Officer Lacentra's body camera footage ends. (*Id.* at 10:40–10:43). Holloway alleges that thirty minutes elapsed before the officers proceeded to the jail, where Holloway was kept overnight. (Doc. 27-2, 41:15–42:5; 43:13–15). When Holloway arrived at the jail, he was able to wash his face for the first time using

the sink in his holding cell—Holloway claims he did not receive any other treatment from law enforcement. (*Id.* at 43:16–44:12).

Holloway spent approximately one day in jail. (*Id.* at 44:17–18). After being released, Holloway took himself to the hospital to receive treatment for injuries sustained during the events leading to his arrest. (*Id.* at 44:25–45:5). The hospital informed Holloway that his injuries were minor and would not require treatment. (*Id.* at 45:12–20). However, due to a persistent burning sensation from the chemical spray, Holloway shaved his hair five days after the incident. (*Id.* at 46:3–15). Ultimately, all charges against Holloway were dismissed. Additionally, the events leading to Holloway's arrest were investigated and Officer Escobar was terminated for his role.

Holloway and Fripp initiated this lawsuit against the City of Orlando, Officer Williams, and Officer Escobar on January 27, 2015. (Doc. 1). The Complaint alleges six federal claims and nine state law claims. The City of Orlando (the "City") and Officer Williams now move for summary judgment on eight of the claims asserted. Officer Williams moves for summary judgment on the following: Count I brought by Holloway for false arrest under 42 U.S.C. § 1983, Count III brought by Holloway for excessive force under § 1983, Count V brought by Holloway for a due process violation based on an alleged material misrepresentation by Officer Williams, Count VII brought by Holloway for false imprisonment, Count IX brought by Holloway for battery, Count XII brought by Holloway for intentional infliction of emotional distress, and Count XIV brought by Fripp for intentional infliction of emotional distress. The City moves for summary judgment on

Count VI, the *Monell* claim, brought by Holloway for violation of his civil rights under § 1983.

## II. STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials." Fed. R. Civ. P. 56(c)(3).

A genuine dispute of material fact is one from which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, "[a] mere scintilla of evidence in support of the non-movant is insufficient to defeat a motion for summary judgment." *Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1249–50 (11th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)). To defeat a motion for summary judgment, the non-moving party must "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). The Court must draw all reasonable inferences in favor of the non-moving party, but may disregard assertions of fact that are "blatantly contradicted" by record evidence, such as video evidence. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

## III. DISCUSSION

### A. Qualified Immunity Analysis

Officer Williams moves for summary judgment as to Counts I and III on the ground that he is entitled to qualified immunity from Holloway's § 1983 false arrest and excessive force claims. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To receive qualified immunity, a government official must have been acting "within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). A government official acts within his discretionary authority when he "perform[s] a legitimate job-related function . . . through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). Once it is established that the official was acting within his discretionary authority, the burden shifts to the plaintiff to make a two-part showing to demonstrate that qualified immunity is not appropriate. *Lee*, 284 F.3d at 1194. First, the plaintiff must establish that the facts of the case, if proven true, make out the violation of a constitutional right. *Scott v. Harris*, 550 U.S. 372, 377 (2007). Second, the constitutional right must have been "clearly established" at the time of the alleged misconduct. *Id.*

While Officer Williams simply asserts that he was acting within the scope of his discretionary duties without providing any argument for that conclusion (Doc. 27, p. 7), the Court finds that Officer Williams was acting within his discretionary authority when he responded to the police dispatch while on duty, secured the area, apprehended Sheals,

and prevented obstruction by other individuals. All of these acts were legitimate job-related functions that were within his power to utilize as a police officer. The burden therefore shifts to Holloway to show the violation of a clearly established constitutional right.

### 1.   Holloway's § 1983 False Arrest Claim (Count I)

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Enshrined within this guarantee is the right to be free from arrests and that are not supported by probable cause. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed." *Brown v. City of Huntsville*, 608 F.3d 724, 734 (11th Cir. 2010). Although a police officer who makes an arrest without probable cause violates the Fourth Amendment, he is nevertheless entitled to qualified immunity if he had "arguable probable cause." *Id.* Arguable probable cause requires the court to ask "whether reasonable officers in the same circumstances and possessing the same knowledge as the [Defendant] *could have believed* that probable cause existed to arrest." *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) (quoting *Lee*, 284 F.3d at 1195) (internal quotation marks omitted).

According to the field report, Holloway was arrested for resisting an officer with violence and battery on a law enforcement officer, (Doc. 27-5, p. 2), both of which are felonies under Florida law, *see* Fla. Stat. §§ 784.07(2)(b), 843.01. However, in his Motion

9

for Summary Judgment, Officer Williams states that Holloway was arrested for resisting an officer without violence, (Doc. 27, p. 9), which is a misdemeanor, see Fla. Stat. § 843.02. The parties are essentially unclear in their briefing which offense(s) Holloway was actually arrested for, and the record evidence cited by the parties fails to conclusively answer the question. In any event, the Court declines to guess at Holloway's charge(s) upon arrest and will consequently deny Officer Williams' Motion for Summary Judgment on the § 1983 false arrest claim.

### 2. Holloway's § 1983 Excessive Force Claim (Count III)

The Fourth Amendment additionally guarantees the right to be free from the use of excessive force during the course of an arrest. See Brosseau v. Haugen, 534 U.S. 194 (2004) (per curiam). "In an excessive force case arising out of an arrest, whether a constitutional violation occurred is governed by the Fourth Amendment's 'objective reasonableness' standard." Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008). To that end, the force used by a police officer in effecting an arrest complies with the Fourth Amendment when an objectively reasonable officer confronted with the same circumstances would find that the force used is not excessive. Graham v. Connor, 490 U.S. 386, 397 (1989). Importantly, the force used by an officer "must be judged on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (subsequent history omitted). In measuring whether the use of force was reasonable, a court must consider myriad factors, including (1) the need for the force, (2) the proportionality of the force used in relation to its need, (3) the extent of the injury inflicted on the arrestee, and (4) whether the force was applied maliciously or

sadistically. *See Hadley*, 526 F.3d at 1329; *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

The facts of this case, if prove true, would establish the use of excessive force by Officer Williams. Holloway's account indicates that Officer Williams was an aggressor who sought physical contact against a merely verbal bystander. Holloway testified that he was complying with Officer Williams' commands to step back when Officer Williams kicked at Holloway's groin and used chemical spray him. A reasonable officer in the same circumstances would not have needed to use such force against a citizen who was complying with the officer's lawful commands. Moreover, the prohibition on the use of force on a law abiding citizen is clearly established. Any reasonable officer would know that using any force on a bystander who was complying with the officer's commands would know that the use of such force violated the Fourth Amendment. Therefore, Officer Williams is not entitled to qualified immunity on Count III.[2]

### B.   Holloway's § 1983 Malicious Prosecution Claim (Count V)

Officer Williams moves for summary judgment on Holloway's § 1983 malicious prosecution claim on the ground that Holloway cannot state a claim for relief.[3] This claim asserts that Officer Williams made material misrepresentations in his arrest affidavit which

---

[2]   To the extent Holloway's excessive force claim against Officer Williams is also brought under the Fourteenth Amendment, it is due to be dismissed because Holloway was not a pretrial detainee during his interactions with Officer Williams. *See Graham v. Connor*, 490 U.S. 386, 395 n.10 (1989) (stating that the Fourteenth Amendment protects pretrial detainees from the use of excessive force when arrest ends and pretrial detention begins).

[3]   While the Complaint labels this claim a "Material Misrepresentation-Deprivation of Liberty Without Due Process" claim, (Doc. 1, p. 17), Holloway agrees in his response to the Motion for Summary Judgment that Count V is a malicious prosecution claim, (Doc. 29, pp. 15–16).

caused him to be falsely prosecuted. (Doc. 1, p. 18). Holloway avers that due to his false statements, Holloway was prosecuted for resisting with violence, resisting without violence, and battery on a law enforcement officer. (Doc. 29, p. 3).[4] In a malicious prosecution claim brought under § 1983, "a plaintiff must prove (1) the elements of the common law tort of malicious prosecution, and (2) a violation of [the] Fourth Amendment right to be free from unreasonable seizures." *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004).

The only argument Officer Williams makes as to Holloway's malicious prosecution claim is that he had arguable probable cause to *arrest* Holloway for resisting without violence. (Doc. 27, p. 17). Officer Williams offers no argument or record evidence speaking to either the common law elements needed for malicious prosecution or a Fourth Amendment violation. Moreover, as the Court noted in its analysis of Holloway's false arrest claim, the field report reflects that Holloway was arrested for resisting an officer with violence and battery on a law enforcement officer, not for resisting an officer without violence. The parties' lack of clarity on what Holloway was arrested for and charged with again preclude summary judgment. Officer Williams' Motion for Summary Judgment will therefore be denied as to Count V.

### C. *Monell* Claim Against the City (Count VI)

The City moves for summary judgment on Holloway's *Monell* claim. When the defendant is a municipality, the plaintiff can establish liability by demonstrating that an action occurred "pursuant to [an] official municipal policy of some nature." *Monell v. Dep't*

---

[4] As noted previously, the parties appear to disagree as to which charges were brought against Holloway. All parties agree that the charge(s) was/were eventually dropped.

*of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978). Municipal policy exists in varying forms. The most commonly found example is the enforcement of an officially endorsed policy such as an ordinance, rule, regulation, code, or policymaker decision. *See, e.g.*, *id.* at 694–95; *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion). However, unofficial or informal policies may also lead to constitutional violations susceptible to liability. Municipalities may, for example, be found liable if an injury results from an unofficial custom or practice that is so extensive, permanent, or pervasive that it essentially "takes on the force of the law." *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004) (internal quotation marks omitted).

Municipalities are responsible for "deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 403–04 (1997). However, municipalities are not liable under § 1983 for random or isolated occurrences or for conduct of which the officials were unaware. *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986). Therefore, although a plaintiff need not demonstrate that a behavior received formal approval by officials, there must be a showing of actual or constructive knowledge. *Id.*

The City is a municipality in Orange County, Florida, and the Orlando Police Department ("OPD") is the City's law enforcement branch. The City shows that OPD has an official policy regarding the use of force which dictates that all employees must be objectively reasonable when determining the necessary amount of force to use against an individual. (Doc. 27-9, p. 2). OPD employees must base their use of force determination on "the totality of the circumstances known to or considered to by the

13

employee at the moment force was used . . . ." (*Id.*). To aid officers in determining the amount of force necessary in a given situation, OPD provides guidelines that suggest when "hard control," "soft control," or other force is appropriate. In his response, Holloway does not dispute that OPD has an official policy governing the use of force and that this official policy was not the cause of his alleged constitutional injuries.

Rather, Holloway hinges his *Monell* claim on the City's failure to adequately train its police officers in the use of force. A municipality's failure to train its officers regarding their duty not to violate citizens' constitutional rights can rise to the level of policy where the failure to train is the result of the municipality's deliberate indifference toward constitutional rights. *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011); *City of Canton*, 489 U.S. at 388. A plaintiff can prove a municipality's deliberate indifference in one of two ways. First, a municipality is deliberately indifferent to constitutional rights where there is a widespread pattern of similar constitutional violations by untrained employees. *Connick*, 131 S. Ct. at 1360. Alternatively, a municipality can be liable for a single incident where "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent." *City of Canton*, 489 U.S. at 390. The City argues that there is no record evidence that any of its officers previously committed a similar constitutional violation to put the City on notice of a need to train with regard to the specific use of force in this case. The burden therefore shifts to Holloway to demonstrate a genuine issue of material fact for trial. *See Riley v. Newton*, 94 F.3d 632, 638 (11th Cir. 1996).

Holloway asserts that the City is not entitled to summary judgment because prior complaints and lawsuits indicate that the City was deliberately indifferent in correcting violative conduct of which the City was aware. Holloway asserts that out of fifty-five cases filed against the City in the last five years, twenty-seven resulted in monetary awards either by settlement or jury verdict. (Doc. 29-4). However, Holloway offers no evidence as to the facts of these twenty-seven cases. Holloway merely produced a list of twenty-seven cases that included the claimant's name, docket number, an "Event Cause Description" of "Excessive Force," and an "Incurred Sum"—the twenty-eight remaining cases provide even less information. (*Id.*). Without more—such as fact summaries, commonalities between cases, or details regarding how or why a matter was resolved—Holloway cannot carry his burden of demonstrating a genuine factual dispute as to whether the City was deliberately indifferent in its alleged failure to train. Accordingly, summary judgment is due to be granted in favor of the City on Holloway's *Monell* claim.

**D.    State Law Claims**

**1.    False Imprisonment and Battery Claims (Counts VII and IX)**

Officer Williams also moves for summary judgment on Holloway's false imprisonment claim (Count VII) and on Holloway's claim for battery (Count IX). Officer Williams argues that he is entitled to summary judgment on these claims because Florida's sovereign immunity statute shields police officers from personal liability in tort for injuries or damages they cause while acting within the scope of their employment.[5] *See* Fla. Stat. § 768.28(9)(a).  Like qualified immunity under federal law, when individual

---

[5]   The Court notes that Officer Williams does not argue that he is entitled to immunity on Fripp's or Holloway's claims for intentional infliction of emotional distress.

15

immunity under § 768.28(9)(a) attaches, the police officer is protected not just from liability, but from being sued for state tort claims. *Furtado v. Yun Chung Law*, 51 So. 3d 1269, 1277 (Fla. Dist. Ct. App. 2011). However, this immunity from suit will not attach and a police officer may face personal liability for injuries and damages he causes where he "act[s] in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 768.28(9)(a). In *Lemay v. Kondrk*, Florida's Fifth District Court of Appeal explained "wanton and willful" conduct in the following way:

> Willful and wanton conduct is generally something more than ordinary negligence but less than deliberate conduct. Most definitions of willful or wanton conduct require that it appear that the defendant had knowledge of existing conditions, was conscious from such knowledge that injury would likely or probably result from his conduct, and with reckless indifference to the consequences consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result.

923 So. 2d 1188, 1192 (Fla. Dist. Ct. App. 2006) (citation omitted).

Here, a reasonable trier of fact could conclude that Officer Williams' actions toward Holloway were committed with wanton and willful disregard of his rights. Record evidence lends support to Holloway's version of the facts, in which Holloway did not commit a crime and complied with all of Officer Williams' commands, but was nevertheless met with force, including a kick to his groin and mace sprayed into his eyes. Officer Williams is therefore not entitled to immunity on Holloway's false imprisonment and battery claims.

### 2. Holloway's and Fripp's Intentional Infliction of Emotional Distress Claims (Counts XII and XIV)

Lastly, Officer Williams moves for summary judgment on Holloway's and Fripp's claims for intentional infliction of emotional distress ("IIED") on the ground that they canot

state a claim for relief. In order to state a claim for IIED, a plaintiff must establish four elements: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was outrageous, (3) the defendant's conduct caused emotional distress to the plaintiff, and (4) the plaintiff's emotional distress was severe. *Stewart v. Walker*, 5 So. 3d 746, 749 (Fla. Dist. Ct. App. 2009). Officer Williams submits that Fripp and Holloway cannot establish the outrageousness and severity elements of their claims.

### a. Outrageousness

"The standard for 'outrageous conduct' is particularly high in Florida." *Patterson v. Downtown Med. & Diagnostic Ctr., Inc.*, 866 F. Supp. 1379, 1383 (M.D. Fla. 1994). Conduct is outrageous where it is "so extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized community." *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. Dist. Ct. App. 1998) (citing Restatement (Second) of Torts § 46 cmt. d). It is insufficient to show tortious or criminal intent and "it is not enough [to show] that the defendant intended to inflict emotional distress." *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1212–13 (Fla. Dist. Ct. App. 1995); *see also E. Airlines, Inc. v. King*, 557 So. 2d 574, 576 (Fla. 1990). Instead, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Clemente*, 707 So. 2d at 867 (quoting Restatement (Second) of Torts § 46 cmt. d).

The Court finds that a genuine factual dispute exists as to whether an average member of the community could deem an officer who kicks and maces a citizen who complies with the officer's commands to be outrageous. *See Williams v. City of Daytona Beach*, No. 604CV1879ORL19KRS, 2005 WL 1421293, at *9 (M.D. Fla. June 16, 2005)

(collecting cases finding that the conduct of a law enforcement officer who utilizes physical contact or abuses his position rises to the level of outrageousness under Florida law). Summary judgment is therefore not appropriate on the grounds that the conduct at issue is not sufficiently outrageous.

### b. Severity of Emotional Distress

Officer Williams next argues that neither Holloway nor Fripp experienced sufficiently severe emotional distress. In their depositions, however, both Holloway and Fripp testified that they are now terrified of police because of Officer Williams' conduct and that, if they speak to a police officer, it causes them to shake. (Doc. 27-2, 56:18–57:4; Doc. 27-3, 69:1–16). Fripp additionally testified that she now has trouble sleeping because of the incident. (Doc. 27-3, 69:1–16). Officer Williams argues that being nervous around law enforcement is a common feeling among the general public and does not rise to the level of severity needed to sustain a claim for IIED. The Court disagrees; it is not a normal or common response for an individual to become so nervous around a police officer that it causes physiological reactions such as shaking or loss of sleep. A genuine factual dispute therefore exists and summary judgment will be denied as to Fripp and Holloway's IIED claims.

## IV. CONCLUSION

For the aforementioned reasons, it is **ORDERED AND ADJUDGED** that Defendants', City of Orlando and Joel Williams, Motion for Summary Judgment (Doc. 27) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. Summary judgment is **GRANTED** as to Count VI and that portion of Count III arising under the Fourteenth Amendment.

    2.      Summary judgment is otherwise **DENIED**.

**DONE AND ORDERED** in Orlando, Florida on August 16, 2016.

                                      PAUL G. BYRON
                                  UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record